In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

NO. 09-23-00065-CV
_____

IN THE INTEREST OF S.N.B.

On Appeal from the 1st District Court
Jasper County, Texas
Trial Cause No. 39599

**MEMORANDUM OPINION**

Mother and Father appeal the trial court's Order of Termination, terminating their parental rights to their child, Susie. Mother and Father filed separate appeals.[1] In two issues, Mother challenges the legal and factual sufficiency of the evidence supporting the predicate ground for termination of her parental rights under section 161.003 of the Texas Family Code, as well as the legal and factual sufficiency of the evidence supporting the trial court's appointment of the Department of Family and Protective Services ("the Department") as Susie's permanent managing conservator.

---

[1]We use pseudonyms to protect the minor's identity. *See* Tex. R. App. P. 9.8 (Protection of Minor's Identity in Parental-Rights Termination Cases).

1

*See* Tex. Fam. Code Ann. §§ 161.003, 161.207. In five issues, Father challenges the legal and factual sufficiency of the evidence supporting the predicate grounds for termination of his parental rights under section 161.001 as well as the trial court's finding that termination of Father's parental rights is in Susie's best interest. *See id.* § 161.001(b)(1)(D), (E), (N), (O), (b)(2). We affirm the trial court's order terminating Mother's and Father's parental rights.

BACKGROUND

On July 22, 2021, the Department received an intake for concerns of physical neglect of Susie. Susie weighed six pounds, five ounces when she was born on July 14, 2021. On July 22, Susie weighed four pounds, eight ounces, and the doctor was concerned that Mother did not understand how to prepare the formula and feed the child. The doctor was "highly concerned that there was a failure to gain weight for the baby." The doctor also expressed concerns about Mother's mental capacity because Mother was developmentally delayed and did not understand the feeding schedule or how to hold the baby during feedings.

When the Department's Investigation Supervisor, Nichole Spiller, met with Mother and Father at their residence, Mother told Spiller that she had been feeding Susie a bottle. When Spiller asked Mother how often she would feed Susie, Mother stated the doctor told her to feed the baby every three hours, but Mother had not fed the baby for five hours. It appeared to Spiller that Mother could repeat the doctor's

2

instructions but did not comprehend them. Spiller testified that Mother couldn't comprehend time, which made her question Mother's cognitive ability to think, leading the Department to request a guardian ad litem for Mother. The Department encouraged Mother to stay with Great Grandmother to learn how to feed and care for the baby. Mother declined, and at some point, Great Grandmother was refused entry into the parents' home.

Spiller asked both Mother and Father to take drug tests because she was concerned there was drug use in the home. Father refused, and then admitted he would test positive for marijuana and alcohol. Mother drug tested and was clean. When the Department removed Susie, they placed her with Great Grandmother. The Department's major concerns at the time of removal were Susie's weight loss and that law enforcement had been called out to the parents' home. After Susie was placed with Great Grandmother, she thrived and gained weight.

On July 29, 2021, the Department filed an Original Petition for Protection of a Child, for Conservatorship, and for Termination in Suit Affecting the Parent-Child Relationship, seeking the termination of Mother's and Father's parental rights. In the Department's First Amended Petition, it requested that Mother's and Father's rights to Susie be terminated under sections 161.001(b)(1)(D), (E), (K), (N), (O), (P) and section 161.003 of the Family Code and alleged that terminating Mother's and Father's parental rights is in Susie's best interest.

3

On November 2, 2022, the trial court conducted a bench trial. Psychologist Dr. Nisha Amin testified that she conducted a psychological evaluation of Mother in January 2022, which included "an interview, a clinical interview, which assessed her mental status as well as her background and any intervention, employment history, residence, and financial bearing[.]" She also tested Mother's intellectual functioning, emotional functioning, and achievement status. These tests included the Weschler Scale abbreviated for intellectual functioning, the Woodcock-Johnson for achievement testing, and the Millon Clinical Multiaxial Scale for behavioral, personality, and emotional functioning.

Based on the Weschler Scale, Dr. Amin determined that Mother has an IQ level of 64 – below the average IQ of 90 to 109. Mother "fell far below on those deviations" and is "in the mild mental retardation range of functioning on all levels." In explaining how a person in that range would function, Amin described that:

> [Mother's] ability to process information is very low. It's difficult for her to understand things. Things that she does understand have to be repeated and reiterated. She has difficulty understanding her environment and then creating a plan for herself to…follow through. In other words, she has to be told what to do, she has to be shown what to do, she has to be reminded of what to do, because for her pretty much every day is a new day.

Because of Mother's limited function, she "has to be directed at all times." According to Dr. Amin, Mother is unable to perform jobs that "require[] multi-tasking because she would be easily overwhelmed and would not be able to function

4

in those capacities." Multi-tasking "would just totally overwhelm her because she's not able to process all that information and then make an analytical decision about what should be prioritized[.]" Dr. Amin conceded that Mother can perform routine tasks and "simple things like hygiene and…cleaning[,]" but even simple activities can "kind of go off the radar" for Mother because of her short memory span.

Based on the Woodcock-Johnson exam, Amin reported that Mother is at the fifth-grade level in reading and writing and at the third-grade level in math. Because she is in the mild mental retardation range, Amin believed that "this is the highest she's going to get" at reading and writing. Because of her low scores, Dr. Amin opined that Mother is "not able to comprehend exactly what she's reading and writing, and that's why the applied problems is difficult for her. She cannot take what she has learned and actually understand it and analyze and then give you an answer."

Dr. Amin also administered the Millon Clinical Multiaxial Inventory, a test designed to "ascertain whether or not…there's a dysfunction or ajar in their reality of how they are performing on a day-to-day basis." Based on this test, she determined that Mother becomes "overwhelmed by too many complexities in her life" and therefore has "difficulty in prioritizing what is right, what is wrong, what do I need to do first which would be in the best interest of people around me." She further explained:

[T]hat overwhelms her and it creates a lot of depression and anxiety for her. And so she becomes very worried and self-punitive. She blames herself a lot – for a lot of the things that she's not able to do. Her communication skills are very limited. She is very conscientious, and because of that, that also leads to a lot of irritability, and then she gets more and more negative about herself.

Dr. Amin explained that relationships are "very difficult" for Mother because of her intellectual functioning. For instance, it's difficult for Mother to "engage in the day-to-day living capacity of a relationship like paying bills, going to work, ensuring that the house is organized, the kids are taken care of." Dr. Amin believed that Mother knows she cannot do these things, which creates emotional concerns for Mother. Dr. Amin agreed that Mother would have difficulty taking care of herself.

As a result of her clinical interview with Mother, Dr. Amin determined that Mother has a "limited understanding of child development, what you should expect at different stages of a child's life." She further explained that Mother has "no understanding for structure or discipline, and she definitely is very dependent on others for her daily functioning." Dr. Amin believed that Mother "doesn't really have a good history of being resilient and coming to different conclusions to help herself." Dr. Amin also noted that during the clinical interview, Mother admitted having a drug history. Dr. Amin expressed that a critical portion of the findings from the clinical interview was that Mother's logic and reality testing is off. Dr. Amin gathered:

She has difficulty sustaining and understanding of what the situation is, but then she tends to go off into different tangents that are not pertinent to the situation. So she doesn't have logical thinking that – that would help her to – to organize her life in – in a comprehensive way.

Based on her interviews and testing, Dr. Amin diagnosed Mother with bipolar disorder, depressive disorder, generalized anxiety disorder, and PTSD from her traumatic upbringing. She also reiterated Mother's mild retardation based on her IQ. Moreover, Mother has cannabis use history and alcohol abuse, both of which are in remission. Finally, Dr. Amin diagnosed Mother with borderline personality with schizoid and negativistic traits. This condition leads to a black and white approach to life, where she is "completely absorbed" in a relationship and unable "to organize different facets of her life."

When asked how these diagnoses affect her ability to care for a young child or infant, Dr. Amin replied:

> She herself needs looking after, so it would be difficult to organize the priorities for herself as well as another individual. An infant, a young child, is very vulnerable and looks to adults for [c]are. But if the adults themselves are going through a lot of mental illness, it becomes very difficult for them to organize those aspects of their lives in terms of structure, discipline. Extra-curricular activities are going to aid this child to . . . thrive. Other aspects include being a good role model. You need to be able to, you know, teach the basic functions of completing hygiene, meeting timetables, teaching them how – what the importance of work is and defining socialization skills. And these are the exact factors that she herself lacks, and that's going to be very difficult for her to be able to take care of a child and ensure that she's going to be able to take [care] of that child in all those ways.

Dr. Amin agreed that Mother can express love and care for her child, but because of her mental status, it will never be a "regular thing" and will be "done unevenly." Dr. Amin explained the child will not know if Mom is "up" or "down" because there is not a uniform way of how Mother "copes on a daily basis." Dr. Amin also opined that the child "may have some special needs of its own given the extraordinary mental health of the mother as well as cognitive defects." Dr. Amin worried that Mother may become flustered and react inappropriately. When asked if one or a combination of the diagnoses render Mother unable to provide for the physical, emotional, and mental needs of the child, Dr. Amin responded "Yes." She also agreed that Mother "would not have a good prognosis for maintaining care for the child over the next 16 to 18 years."

In addition to Dr. Amin, several other witnesses testified at trial: (1) Nichole Spiller, the Department's Investigation Supervisor who initially removed Susie from Mother's and Father's home; (2) Department Caseworker Tammy Brister; (3) Department Conservatorship Caseworker Yaritza Caban-Quinones; (4) Father; (5) Father's guardian ad litem; (6) Mother; (7) Mother's guardian ad litem; and (8) Great Grandmother.

Caseworker Brister was first assigned to this case in October 2021, just a few months after it started. Her first interaction with Mother was during a parent-child visit at Great Grandmother's home. A visitation schedule was established, but

Mother was inconsistent with making the visits. Mother blamed a lack of transportation or being busy for missing the visits. However, Brister offered to take Mother to visits with Susie, but Mother was "hard to get a hold of, especially if she was with the father of the child. There would be weeks on end where I couldn't get a hold of the mother or father."

Brister observed several visits between Mother and Susie. She testified that Mother "would not take direction from anybody when it came to caring for the child." When given advice by either the Great Grandparents or Brister, Mother would become defensive and state that she knew how to take care of her child. A few times, Mother left the residence after receiving feedback. During one office visit, Brister observed Mother treat Susie "like a baby doll, like she was playing with a baby doll." Brister testified that Mother did not change Susie, and she only fed Susie a half an ounce and then gave her back to the caregiver.

Brister noted that Father only attended two visits with Susie during the case. Although Father claimed that he wanted to participate, for a year and a half he did not attempt to attend visits. Brister did not believe there was anything preventing Father from visiting with Susie, and she set up virtual visits every week, but Father failed to attend. Brister related that Susie's caregivers do not believe that Father should have any contact with Susie.

The Department created a family plan of service for Mother and Father and both parents agreed to work services. The trial court took judicial notice of all the orders in its file and the family plans of service.[2] Brister reviewed the service plan at nearly every visit with Mother. The two discussed the service plan and what Mother needed to do to complete it. Mother indicated she understood and was able to repeat the services she needed to do, but never followed through. Mother completed her psychological, ADAC assessment, and outpatient treatment. Neither Mother nor Father completed their service plan.

Brister also expressed her difficulty in contacting Mother and Father. She testified that she would go "weeks on end" where she could not reach Mother or Father, even though she attempted to go to their residence every week. She particularly noted the inconsistent communication with Father. Father admitted his drug use but did not address his drug issues during the pendency of the case. Father did attend an inpatient facility but was kicked out within five days and went to another detox facility, where he was currently living. Brister described the home that Mother and Father shared as "not appropriate." It lacked heating, air conditioning,

---

[2]We note that the trial court could have properly taken judicial notice that it signed an order adopting the family service plan and what the plan listed as the necessary requirements Mother and Father were required to complete before their child would be returned to them, but it could not take judicial notice of the truth of the allegations in its records. *See In re J.E.H.*, 384 S.W.3d 864, 870 (Tex. App.—San Antonio 2012, no pet.).

10

and hot water and there was trash everywhere. The parents used an extension cord from a neighboring home to get electricity. After the parents split up, Father went to treatment, and Mother moved to a camper with no water or heat. Brister described the camper as "just not safe for a child."

Brister testified that it was in Susie's best interest for the Department to have permanent managing conservatorship of the child, for both parents' rights to be terminated, and for Great Grandparents to be given the opportunity to adopt Susie. Brister testified that Mother and Father would never be able to care for Susie. Despite trying to contact Mother and Father almost every week for a year and a half, neither parent had shown progress until recently. Brister believed that the Department had done everything it could to help Mother and Father complete their services. Brister did not believe that either Mother or Father had the mental capacity to provide for the physical, emotional, and mental needs of Susie until she turned eighteen. Brister noted there was no psychological evaluation of Father because he failed to do anything on his services to achieve sobriety. Brister explained that Susie was placed with Great Grandparents shortly after her birth and had bonded with them and recognized them as her caregivers. Brister opined that Great Grandparents have done a "wonderful job" taking care of Susie and that Susie was "very well taken care of."

Caseworker Caban-Quinones agreed that Susie was connected to her Great Grandparents and doing very well in her placement. Caban-Quinones explained

11

Susie was happy, laughs, and is "starting to talk and say a few words." Caban-Quinones testified that the Department's permanency goal is relative adoption with a concurrent goal of relative conservatorship. Caban-Quinones agreed with Brister that Mother had not completed her service plan. She also noted that Mother had been inconsistent with her visits with Susie, and whenever she did visit, Mother had a hard time taking directions or modeling the caregiver. Caban-Quinones noted that the Department's main concern with Mother was her capacity to care for her child. The Department's other concerns included unaddressed family violence and Mother's lack of mental health treatment. She also noted that Mother did not have a stable home, job, or any income and that the "last concerning" drug test for Mother was on March 28, 2022. She further explained that due to Mother's mental capacity, she was unable to demonstrate parental skills. Based on her interactions with Mother, Caban-Quinones believed that she needed assistance to care for her child until the child reached eighteen.

With respect to Father, Caban-Quinones testified that he failed to complete his service plan and had been inconsistent with drug testing. Caban-Quinones explained that Father completed his drug and alcohol assessment, was currently working on his sobriety, and reported he was employed. Father attended Cenikor, but after an incident, he started working services at a detox facility, where he had a positive social support system and attended church.

12

Father admitted that his drug addictions prevented him from completing services but asked that the court not terminate his rights to Susie. He acknowledged that he had recently entered a sobriety program, and he stated that he was told he was "fixing to lose" his parental rights so he had to "clean up and go to a rehab." Father had no explanation of why he didn't attend visits with Susie, and he admitted he had only seen her a "few times" during the case and that she probably did not know who he was. Father believed that he had a "great support system" at the recovery center as well as his job, where he makes $13 an hour and works 40 hours a week. He had a sponsor and attended AA/NA every day but did not have his own transportation or a home where he could take care of Susie.

Mother testified that she lived with her mother, a person that caseworker Brister described as "not appropriate" for Susie. Despite being unemployed, Mother believed she could take care of Susie because her "mom helps out." However, she agreed that it was in Susie's best interest to be with her Great Grandparents. Mother testified that she wanted to develop a relationship with Susie and had done everything her caseworker asked her to do. Regarding her ability to feed Susie, Mother testified that she holds the baby when she feeds her and that she fed Susie "like I was supposed to." When the doctor told Mother that Susie had lost twelve percent of her bodyweight, Mother replied that "all babies lose 12 percent of their

birth weight and they gain it back…. It is normal for babies to lose weight because they gain it straight back."

Amy Blythewood, Mother's guardian ad litem, told the court that "this is one of those cases that the mental health ground is made for. I – I just think that her mental and emotional condition will preclude her from ever being a safe and effective parent." Blythewood explained she had reviewed the psychological and one of the things that struck her was that Mother acts "contrary and oppositional" which causes a reaction with other people, like the Great Grandmother. Blythewood also noted Mother's procrastination and was "never able to fully articulate what is so important that she can't work services for her child." Moreover, Blythewood expressed concern about Mother's inability to understand and follow through with her services, and that Mother had "one of the best" parenting instructors in the area doing one-on-one instruction, but Mother was discharged because of a "distinct lack of progress."

Blythewood noted that Mother was "very honest and up front at times about the domestic violence in her home with the father in this case." Blythewood expressed concern that Mother "doesn't understand that that's not acceptable behavior, and she would absolutely take a child back in that environment." After listening to Mother's and Father's testimony, Blythewood told the court that the most concerning thing about their testimony is that "it's all about them. It's not about

this baby. It's not about what's in her best interest. It's about what they want." Blythewood concluded, "I just think that she has a mental condition that precludes her from being a parent." She also opined that the case had been over "500-and-plus-odd days", and the Department had made reasonable efforts to return Susie to Mother, but Mother was unable to complete her services.

Great Grandmother testified that Mother did not have the ability to take care of Susie because she was unable to understand and fully comprehend what needed to be done. Great Grandmother believed it was unlikely that Mother would be able to continue to care for and provide for Susie for the next sixteen or seventeen years. Great Grandmother agreed that Mother's main handicap was her lack of mental capacity, which had existed since she was about eight or nine years old. Great Grandmother tried to show Mother how to take care of Susie, but Mother would not listen. Great Grandmother did not think Mother was capable of bonding with Susie.

Great Grandmother witnessed domestic violence between Mother and Father. Great Grandmother explained one incident when she went to the parents' home to check on Susie, and she had to "step[] in front of [Mother]" to prevent anything from happening. She also observed Mother with a bruised nose and black eyes. Great Grandmother obtained a restraining order against Father so he could not come onto her property, because she was afraid he might hurt her or Susie. Based on her interactions with Father, she did not believe that Father had the ability to care for

Susie. Great Grandmother testified that she wanted to adopt Susie and allow Mother to have a relationship with Susie.

The trial court terminated Mother's and Father's parental rights to Susie and appointed the Department permanent managing conservator of Susie. As to Mother, the trial court found that Mother has a mental or emotional illness that renders her unable to provide for the child and that termination of Mother's parental rights was in Susie's best interest. Tex. Fam. Code Ann. § 161.001(b)(2), 161.003(a). The trial court also found that termination of Father's parental rights was in Susie's best interest and that there were four statutory bases for termination including condition endangerment, conduct endangerment, constructive abandonment, and failure to comply with a court-ordered family service plan. *Id.* § 161.001(b)(1)(D), (E), (N), (O), (2).

## STANDARD OF REVIEW

The Department had the burden to prove the allegations in its petition by clear and convincing evidence. *See In the Interest of J.W.*, 645 S.W.3d 726, 740 (Tex. 2022); Tex. Fam. Code Ann. § 161.001(b). As defined by the Family Code, clear and convincing evidence "means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007. Under a legal-sufficiency review, we determine whether "a reasonable trier of fact could have

16

formed a firm belief or conviction that its finding was true." *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). In reviewing the evidence, we "look at all the evidence in the light most favorable to the finding[,]" "assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so," and "disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible." *Id.* In our review we will not disregard "undisputed facts that do not support the finding" that a party is challenging in an appeal. *Id.* When deciding whether a reasonable trier of fact could have formed a firm belief or conviction that the evidence supports a finding challenged in an appeal, we defer to the factfinder's role as the "'sole arbiter of the witnesses' credibility and demeanor'" when the inferences it drew from the evidence before it were reasonable. *In re J.F.-G.*, 627 S.W.3d 304, 312 (Tex. 2021); *see In re J.W.*, 645 S.W.3d at 741.

When conducting a factual-sufficiency review, we "give due deference" to the findings that are based on the direct and circumstantial evidence admitted by the trial court. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (cleaned up). In a factual sufficiency review, the question we must decide is not what we would have found from the evidence had we been seated as the factfinder. *See id*. Rather the question is whether from the evidence as a whole the factfinder could "reasonably form a firm belief or conviction about the truth of the [Department's] allegations." *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002). To support an argument that the evidence is factually

17

insufficient to support a verdict, the parent challenging the verdict should explain why the factfinder could not have credited the evidence the parent challenges in favor of the finding the parent disputes. *See In re J.F.C.*, 96 S.W.3d at 266. A reviewing court will not find the evidence factually insufficient unless "in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction" in favor of its finding. *Id.* at 267.

## MOTHER'S APPEAL

In her first issue, Mother argues that the evidence is legally and factually insufficient to support a finding that her parental rights should be terminated pursuant to Section 161.003 of the Family Code. Section 161.003(a) permits the termination of parental rights if five elements are met. *Id.* Termination of the parent-child relationship may be ordered if the court finds that:

> (1) the parent has a mental or emotional illness or mental deficiency that renders the parent unable to provide for the physical, emotional, and mental needs of the child;
>
> (2) the illness or deficiency, in all reasonable probability, proved by clear and convincing evidence, will continue to render the parent unable to provide for the child's needs until the 18th birthday of the child;
>
> (3) the department has been the temporary or sole managing conservator of the child of the parent for at least six months preceding the date of the hearing on the termination . . . ;

18

(4) the department has made reasonable efforts to return the child to the parent; and

(5) the termination is in the best interest of the child.

*Id.* § 161.003(a)(1)-(5).

"A mental illness or deficiency of a parent is not, in and of itself, grounds for termination of the parent-child relationship." *In re B.J.C.*, 495 S.W.3d 29, 36 (Tex. App.—Houston [14th Dist.] 2016, no pet.). Evidence must support a determination that a parent's mental illness or deficiency prevents her from providing for her child now and in the future. *Id*. Mother only challenges the sufficiency of the evidence on subsections (1), (2), (4), and (5), arguing that the Department has failed to show how Mother's diagnoses rendered her unable to provide for Susie now or in the future.

<u>Section 161.003(a)(1)</u>

With an IQ of 64, Mother has extremely low intelligence. She reads at a fifth-grade level and is at third-grade level in math. The tests Dr. Amin administered revealed that she has a very low ability to process information and trouble retaining information. Dr. Amin determined that Mother has difficulty in sustaining and understanding situations, or logically thinking in a way that would help organize her life. Based on her evaluation, Dr. Amin concluded that Mother "has limited understanding of child development, what you should expect at different stages of life. She has no understanding for structure or discipline, and she is very dependent on others for her daily functioning."

Dr. Amin diagnosed Mother with depressive order and bipolar disorder, generalized anxiety disorder, PTSD, mild mental retardation, borderline personality with schizoid and negativistic traits, as well as cannabis use and alcohol abuse that are in remission. When asked if her diagnoses would affect her ability to care for a young child or infant, Dr. Amin explained that "she herself needs looking after, so it would be difficult for her to organize the priorities for herself as well as another individual" and that Mother would not be able to teach basic functions to a child because she herself lacks those functions. In addition, Caban-Quinones, Brister, and Mother's guardian ad litem testified that they believed that Mother's mental and emotional condition will preclude her from ever being a safe and effective parent. Dr. Amin's expert conclusions, coupled with the testimony from lay witnesses, constitute clear and convincing evidence that Mother has a mental deficiency that renders her unable to provide for Susie's physical, emotional, and mental needs. *See In re E.R.*, 555 S.W.3d 796, 807–08 (Tex. App.—Houston [14th Dist.] 2018, no pet.).

Section 161.003(a)(2)

"Section 161.003 does not require scientific certainty that [a parent's] mental illness [or deficiency] will continue until the children are eighteen; it only requires reasonable probability." *Salas v. Tex. Dep't of Protective & Regulatory Servs.*, 71 S.W.3d 783, 790 (Tex. App.—El Paso 2022, no pet.) (citations omitted). Dr. Amin

20

opined that Mother's diagnoses renders Mother unable to provide for the physical and emotional needs of the child and agreed that Mother "would not have a good prognosis for maintaining" care for the child over the next sixteen to eighteen years. Furthermore, Great Grandmother agreed that Mother would be unable to care for Susie for the next sixteen to eighteen years. Dr. Amin's opinion supports the trial court's conclusion that Mother's mental deficiency probably will continue to render her unable to meet Susie's needs until her 18th birthday. *See In re B.J.C.*, 495 S.W.3d at 37–38 (recognizing psychologist's testimony that parent's intellectual disability was "permanent and incapable of treatment" was among evidence satisfying section 161.003(a)(2)).

Section 161.003(a)(4)

Mother argues that as to subsection (4), "the service plan that was offered cannot be considered a reasonable effort since the supportive services that were promised with the plan were not made available to the mother." "Implementation of a family plan of service by the Department is generally considered a reasonable effort to return a child to a parent." *In re E.R.*, 495 S.W.3d at 808–09 (citation omitted). The trial court could have considered that the Department created and administered a service plan for Mother. Likewise, the trial court could have considered testimony from caseworker Brister and Mother's guardian ad litem about the Department's continuous efforts and offers to provide transportation to help

21

Mother complete the service plan. For instance, Brister testified that she attempted to go to Mother's residence every week, reviewed the service plan with Mother and had long conversations about what Mother needed to do, but Mother would not follow through. Blythewood opined that the Department had made reasonable efforts to return Susie to Mother, including Brister providing Mother opportunities to do services and "begging" Mother to get her own place and complete services.

Section 161.003(a)(5)

Mother also argues that the evidence was legally and factually insufficient to support that terminating her parental rights is in Susie's best interest. When deciding whether terminating a parent's rights is in a child's best interest, the inquiry is necessarily "child-centered and focuses on the child's well-being, safety, and development." *In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018). Generally, when examining the evidence supporting a best interest finding, we compare the evidence admitted at trial against the non-exhaustive factors the Texas Supreme Court identified in *Holley v. Adams*. *See Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). The non-exhaustive factors include: (1) the desires of the child; (2) the child's emotional and physical needs now and in the future; (3) emotional and physical danger to the child now and in the future; (4) parental abilities of the individuals seeking custody; (5) programs available to assist these individuals to promote the child's best interest; (6) plans for the child by these individuals or by the agency

22

seeking custody; (7) stability of the home or proposed placement; (8) acts or omissions of the parent which may indicate that the existing parent-child relationship is not proper; and (9) any excuse for the acts or omissions of the parent. *Id.*; *see also* Tex. Fam. Code Ann. § 263.307(b). No particular *Holley* factor is controlling, and evidence of one factor may be sufficient to support a finding that termination is in a child's best interest. *In re A.P.*, 184 S.W.3d 410, 414 (Tex. App.—Dallas 2006, no pet.).

The best interest determination may rely on direct or circumstantial evidence, subjective facts, and the totality of the evidence. *In re N.R.T.*, 338 S.W.3d 667, 677 (Tex. App.—Amarillo 2011, no pet.). A parent's inability to provide a stable home and failure to comply with a family plan of service support a finding that termination is in the child's best interest. *In re M.R.*, 243 S.W.3d 807, 821 (Tex. App.—Fort Worth 2007, no pet.). The evidence showed that despite the Department's assistance, Mother could not complete her service plan. Even though Mother attended one-on-one parenting classes with "one of the best" instructors in the area, she was discharged from the classes because of her distinct lack of progress. Based on the evidence, the trial court could have believed that even if Mother were to take advantage of all the parenting programs the Department offered that her skills to effectively parent a child to adulthood are unlikely to improve.

A parent's mental capacity is probative of the best interest determination because mental issues are relevant to the ability to care for the child's physical and emotional needs throughout the child's life. *In re J.P.-L.*, 592 S.W.3d 559, 582–83 (Tex. App.—Fort Worth 2019, pet. denied) (citations omitted). The record reflects that Mother has an IQ of 64, a low ability to process information, and difficulty in engaging in the day-to-day activities of a relationship. Furthermore, Dr. Amin testified that because of her mental illness, Mother would have difficulty taking care of herself and organizing priorities for herself or another individual. Likewise, Mother has limited understanding of child development, and according to Dr. Amin, she would not be able to teach basic functions to a child. The record also reflects that Mother did not understand the importance of feeding Susie as an infant, and as a result, Susie failed to gain weight and only thrived after being placed with Great Grandmother.

The evidence showed that Susie had bonded with Great Grandparents and was well-cared for. *See In re J.M.*, 156 S.W.3d 696, 706 (Tex. App.—Dallas 2005, no pet.). Great Grandmother testified that she wanted to adopt Susie. When children are too young to express their desires, the factfinder may consider whether the children have bonded with the foster family, are well-cared for by them, and have spent minimal time with a parent. *In re J.D.*, 436 S.W.3d 105, 118 (Tex. App.—Houston [14th Dist.] 2014, no pet.).

24

We conclude the evidence is legally and factually insufficient to support a finding that Mother suffers from a mental deficiency as set forth in Section 161.003 and that termination of Mother's parental rights is in Susie's best interest. *See* Tex. Fam. Code Ann. § 161.003(a). We overrule Mother's first issue.

APPOINTMENT OF DEPARTMENT AS MANAGING CONSERVATOR

In her second issue, Mother contends the trial court erred by appointing the Department as Susie's sole managing conservator. To begin, we note that Mother didn't raise a separate issue claiming there is insufficient evidence to show that appointing her would have significantly impaired Susie's physical health or emotional development, which is what the trial court found.

When a trial court terminates the parent-child relationship of both parents, the Family Code provides the trial court with three choices as to whom it should name as the child's managing conservator: (1) a suitable, competent adult; (2) the Department; or (3) a licensed child-placing agency. Tex. Fam. Code Ann. § 161.207(a). When Family Code section 161.207 is the sole basis of the trial court's appointment of the Department as a child's conservator, the parent's challenge to the trial court's best interest finding is considered as raising an issue challenging the trial court's appointment of the Department as the child's managing conservator. *See id.* § 161.207; *In re D.N.C.*, 252 S.W.3d 317, 319 (Tex. 2008) (holding the parent's

25

challenge to the Department's appointment as the child's managing conservator "was subsumed in her appeal of the parental-rights termination order").

However, when the trial court has appointed the Department as the child's managing conservator based on its authority under Chapter 153 of the Family Code – the chapter addressing conservatorship, possession, and access – the parent must challenge the trial court's appointment of the Department as the child's managing conservator to preserve a challenge to the Department's appointment. *See* Tex. Fam. Code Ann. §§ 153.001-.709; *In re J.A.J.*, 243 S.W.3d 611, 615–17 (Tex. 2007) (explaining that a parent must raise an issue in the appeal challenging the trial court's appointment of the Department when the findings show the Department was appointed under Family Code section 153.131 because a challenge based on findings under section 151.131 is not subsumed by a parent's claim that terminating the parent-child relationship is not in the child's best interest); *In the Int. of L.M.*, No. 09-22-00307-CV, 2023 Tex. App. LEXIS 1565, at *10 (Tex. App.—Beaumont Mar. 9, 2023, no pet. h.).

When the Department filed its First Amended Petition, it asked the trial court to name it as Susie's sole managing conservator should the court determine that appointing Susie's parents would not be in Susie's best interest because their appointment would significantly impair Susie's physical health or emotional development. The trial court's order tracks the findings that Family Code section

26

153.131 requires, which indicates the trial court appointed the Department as Susie's conservator under the authority granted to it by Chapter 153 and not Chapter 161. The trial court's order appointing the Department as Susie's managing conservator states: "The Court finds that the appointment of the Respondents as permanent managing conservator of the child is not in the child's best interest because appointment would significantly impair [the] child's physical health or emotional development." *See* Tex. Fam. Code Ann. § 153.131.

Since Mother didn't specifically challenge the trial court's conservatorship findings or the trial court's decision appointing the Department to be Susie's managing conservator based on its authority to do so under Chapter 153, we overrule Mother's second issue. *In re J.A.J.*, 243 S.W.3d at 615–17; *In the Int. of L.M.*, 2023 Tex. App. LEXIS 1565, at *10-*11.

## FATHER'S APPEAL

In issues one and two, Father argues the evidence is legally and factually insufficient to support the trial court's findings of condition endangerment and conduct endangerment, the predicate grounds for terminating a parent-child relationship under subsections 161.001(b)(1)(D) and (E). Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E). While similar, the subsections are not identical. Under subsection D, the Department had to prove, by clear and convincing evidence, that Father knowingly placed Susie or allowed Susie to remain in conditions or

27

surroundings that endangered her physical or emotional well-being. *Id.* § 161.001(b)(1)(D). Under subsection E, the Department needed to prove, by clear and convincing evidence, that Father engaged in conduct or knowingly placed Susie with a person who engaged in conduct which endangered Susie's physical or emotional well-being. *Id.* § 161.001(b)(1)(E). Under either subsection D or E, the term "endanger" means "expose to loss or injury; to jeopardize." *In re J.F.-G.*, 627 S.W.3d at 313 (quoting *Endanger*, Webster's New Twentieth Century Dictionary of the English Language 599 (1976)). Generally, a parent's conduct that subjects a child to a life of uncertainty and instability endangers a child's physical and emotional well-being. *See In re J.O.A.*, 283 S.W.3d 336, 345 n.4 (Tex. 2009) (citing *In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied)). However, "it is not necessary that the conduct be directed at the child or that the child actually suffers injury." *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987) (citation omitted).

Often, evidence used to establish violations of subsections D and E overlaps. Subsection D doesn't require evidence that a parent engaged in conduct multiple times, and evidence that a parent engaged in either acts or omissions that endangered a child, even a single act or omission, may suffice. *In re L.E.S.*, 471 S.W.3d 915, 925 (Tex. App.—Texarkana 2015, no pet.) (citing *In re A.B.*, 125 S.W.3d 769, 776 (Tex. App.—Texarkana 2003, pet. denied)). Allegations involving subsection D

28

violations require that courts examine the period before the Department removed the child from the home to evaluate the parent that placed or allowed the child to remain in a condition that endangered the child's physical or emotional well-being. *Id.* (citing *In re L.C.*, 145 S.W.3d 790, 795 (Tex. App.—Texarkana 2004, no pet.)). In contrast, allegations involving subsection E violations, may be "based on conduct both before and after removal." *In re A.L.H.*, 515 S.W.3d 60, 93 (Tex. App.—Houston [14th Dist.] 2017, pet. denied) (citing *In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied)).

In cases involving claims to terminate a parent's rights to a child, domestic violence may be considered by the finder of fact as evidence that a parent has engaged in conduct or created a condition that endangers a child. *See In re K.P.*, No. 09-13-00404-CV, 2014 WL 4105067, at *14 (Tex. App.—Beaumont Aug. 21, 2014, no pet.) (mem. op.) (citing *In re C.J.O.*, 325 S.W.3d 261, 265 (Tex. App.—Eastland 2010, pet. denied)). "'[A]busive or violent conduct by a parent or other resident of a child's home may produce an environment that endangers the physical or emotional well-being of a child.'" *In re Z.L.M.*, No. 09-14-00457-CV, 2015 WL 474400, at *3 (Tex. App.—Beaumont Feb. 5, 2015, no pet.) (mem. op.) (quoting *In the Interest of J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.)).

Courts may consider whether a parent's drug use continues after the child is removed from the parent's care, as such conduct shows a voluntary, deliberate, and

29

conscious course of conduct that endangers a child's well-being. *See In re J.S.*, 584 S.W.3d 622, 635–36 (Tex. App.—Houston [1st Dist.] 2019, no pet.); *see also In re M.E.-M.N.*, 342 S.W.3d 254, 263 (Tex. App.—Fort Worth 2011, pet. denied). The trial court may infer from a parent's refusal to submit to a drug test that they are using drugs. *See In re K.C.B.*, 280 S.W.3d 888, 895 (Tex. App.—Amarillo 2009, pet. denied). Evidence of a parent's failure to comply with services to improve their mental health is also a factor the trial court can consider in determining whether a parent has engaged in a course of conduct that endangered the physical and emotional well-being of a child. *In re S.R.*, 452 S.W.3d at 365.

Viewing the evidence in the light most favorable to the trial court's findings, we conclude that the trial court could reasonably have formed a firm belief or conviction that Father knowingly placed or knowingly allowed Susie to remain in conditions or surroundings which endangered her physical or emotional well-being and engaged in conduct or knowingly placed Susie with persons who engaged in conduct that endangered Susie's physical or emotional well-being. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E); *In re J.F.C.*, 96 S.W.3d at 266. The evidence showed that Father failed to complete his services, including submitting to drug testing and completing a psychosocial evaluation and following all recommendations made by the evaluation. Moreover, he admitted to using drugs during the first year and half of the case while Susie remained in foster care, and he

30

did not begin drug treatment until eight days after trial started. The trial court also heard that the Department had domestic violence concerns regarding Father, that Great Grandmother witnessed bruises and a broken nose on Mother and filed a restraining order against Father for fear he would hurt her or Susie. We hold the evidence is legally and factually sufficient to support the predicate termination findings under subsections D and E.

Having determined that the evidence is sufficient to support the trial court's findings on these statutory grounds, we need not consider whether the evidence would support subsection N or O – the other grounds for termination challenged in Father's third and fourth issues. *In re B.K.D.*, 131 S.W.3d 10, 16 (Tex. App.—Fort Worth 2003, pet. denied); *see also* Tex. R. App. P. 47.1.

## THE BEST INTEREST FINDING

In his fifth issue, Father contends the evidence is legally and factually insufficient to support the trial court's best interest finding. Under the Family Code, there is a strong presumption that keeping a child with a parent is in the child's best interest. Tex. Fam. Code Ann. § 153.131(b); *see In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (noting that a "strong presumption" exists favoring keeping a child with a parent). Even so, it is also presumed "the prompt and permanent placement of the child in a safe environment is . . . in the child's best interest." Tex. Fam. Code Ann. § 263.307(a). When determining whether terminating the parent-child relationship

31

is in the child's best interest, we consider the non-exclusive *Holley* factors. *See Holley*, 544 S.W.2d at 371–72. In a best interest analysis, the courts focus on the best interest of the child, not the best interest of the parent. *Dupree v. Tex. Dep't of Protective & Regulatory Servs.*, 907 S.W.2d 81, 86 (Tex. App.—Dallas 1995). The evidence supporting the predicate findings under subsections D and E may also support the trial court's best interest finding. *In re T.R.S.*, No. 09-18-00482-CV, 2019 WL 2455273, at *5 (Tex. App.—Beaumont June 13, 2019, no pet.) (mem. op.). The Department need not present evidence to support each of the *Holley* factors, as the lack of evidence on some factors will not preclude the factfinder from forming a strong conviction that terminating the parent-child relationship is in a child's best interest, particularly when the evidence is undisputed that the parent endangered the child. *In re C.H.*, 89 S.W.3d at 27.

The evidence shows that Father's history of domestic violence supports the trial court's best interest finding. The factfinder may infer from past conduct endangering the child's well-being that similar conduct will recur if the child is returned to the parent. *In re M.R.J.M.*, 280 S.W.3d 494, 502 (Tex. App.—Fort Worth 2009, no pet.). Therefore, the trial court could have reasonably considered that Father's acts of violence would continue in the future. The evidence that Father failed to comply with his service plan also supports the trial court's best interest determination. *See In re E.C.R.*, 402 S.W.3d 239, 249 (Tex. 2013). The trial court

32

took judicial notice of the parents' service plans and the Department's caseworker testified regarding the tasks in Father's service plan. The tasks in Father's service plan included completing a Batterers Intervention and Prevention Program; completing a psychological; completing a mental health assessment; ensuring stable and safe housing; obtaining legal income; completing a drug assessment; submitting to random drug screens; completing parenting classes; and following the general rules and requirements set out by the Department. The caseworker testified that the only thing Father completed on his service plan was the drug assessment and inpatient treatment, which he entered after trial started. Even Father admitted the reason he went to rehab was because the caseworker told him he was going to lose his child.

Evidence of a parent's unstable lifestyle can also support a factfinder's conclusion that termination of parental rights is in the child's best interest. *In re S.B.*, 207 S.W.3d 877, 887 (Tex. App.—Fort Worth 2006, no pet.). Lack of stability, including a stable home, supports a finding that the parent is unable to provide for a child's emotional and physical needs. *See In re G.M.G.*, 444 S.W.3d 46, 59–60 (Tex. App.—Houston [14th Dist.] 2014, no pet.). The record reflects that caseworker Brister visited Mother's and Father's home and found that it was inappropriate for a child. Father testified at trial that he did not have a residence for Susie. He also conceded that he only saw Susie a few times during the case and that she probably

did not know who he was. In contrast, the evidence showed that Susie had bonded with Great Grandparents and was well-cared for. *See In re J.M.*, 156 S.W.3d at 706. Great Grandmother testified that she wanted to adopt Susie, and a child's need for permanence through the establishment of a "'stable, permanent home'" has been recognized as a paramount consideration in a best interest determination. *See In re K.C.*, 219 S.W.3d 924, 931 (Tex. App.—Dallas 2007, no pet.) (citations omitted).

Deferring to the trial court's role as the sole arbiter of the facts, we hold the record contains legally and factually sufficient evidence to support the trial court's best interest finding. *See* Tex. Fam. Code Ann. §§ 161.001(b)(2), 263.307(a); *see also In re J.F.C.*, 96 S.W.3d at 266; *Holley*, 544 S.W.2d at 371–72. We overrule Father's fifth issue. Having addressed all of Mother's and Father's dispositive issues, we affirm the trial court's order terminating Mother's and Father's parental rights.

AFFIRMED.

_____
W. SCOTT GOLEMON
Chief Justice

Submitted on May 30, 2023
Opinion Delivered July 27, 2023

Before Golemon, C.J., Horton and Wright, JJ.